793 F.2d 1110
 122 L.R.R.M. (BNA) 2921, 55 USLW 2060,
104 Lab.Cas. P 11,913,
1986-1 Trade Cases 67,180
 SUN-LAND NURSERIES, INC., a California corporation,
Plaintiff-Appellant,
v.
SOUTHERN CALIFORNIA DISTRICT COUNCIL OF LABORERS;
Affiliated Laborers Local Union 300; Affiliated
Laborers Local Union 652; and
Affiliated Laborers Local
Union 1082,
Defendants-
Appellees.
 No. 85-6029.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 18, 1986.
Decided July 8, 1986.
 
 Scott A. Wilson, Littler, Mendelson, Fastiff & Tichy, San Diego, Cal., for plaintiff-appellant.
 Julius Reich, Reich, Adell & Crost, Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before BROWNING, Chief Judge, KENNEDY, FLETCHER, PREGERSON, ALARCON, CANBY, BOOCHEVER, NORRIS, REINHARDT, WIGGINS and BRUNETTI, Circuit Judges.
 BOOCHEVER, Circuit Judge:
 
 
 1
 In this appeal we are required to construe a provision of the National Labor Relations Act (NLRA) and to reconcile policies expressed in labor and antitrust legislation.
 
 
 2
 Sun-Land Nurseries, Inc. (Sun-Land) appeals from a summary judgment denying its claims under the NLRA and sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1, 2 (1982). It contends that collective bargaining agreements restricting subcontracting to employers which use employees of specified unions violate section 8(e) of the NLRA, 29 U.S.C. Sec. 158(e) (1982). Section 8(e), in general terms, prohibits "hot cargo" agreements, provisions requiring employers to cease doing business with any other person. Sun-Land further argues that the agreements constitute antitrust violations under the Sherman Act. A panel of this court affirmed the district court's holding that the agreement comes within the proviso to section 8(e) which exempts the construction industry from that section's terms. The panel, however, reversed the district court's award of summary judgment to the union on the Sherman Act claims. Sun-Land Nurseries, Inc. v. Southern California District Council of Laborers, 769 F.2d 1381 (9th Cir.1985), withdrawn, 779 F.2d 1446 (9th Cir.1986) (ordering rehearing en banc).
 
 
 3
 We took this case en banc to determine whether a provision of a collective bargaining agreement falling within the construction industry proviso is, without more, sufficient evidence of an antitrust violation to withstand a summary judgment motion. While we find that the proviso does not confer automatic exemption from the antitrust laws, we affirm the district court because Sun-Land made no showing of conduct allegedly violative of antitrust laws other than the collective bargaining agreement's subcontracting provision. We hold that such a provision is not enough to raise a triable issue of antitrust liability.
 
 I. FACTS
 
 4
 Sun-Land is a landscaping company which contracts with general contractors on major construction projects. The present dispute arose after the Teamsters Local 420 (Teamsters) terminated its representation of Sun-Land's employees either because of an internal power struggle or in the hope of improving its relations with the Southern California District Council of Laborers (Laborers). Sun-Land sued the Teamsters, and this court held that the termination constituted a violation of the collective bargaining agreement between the Teamsters and Sun-Land. Toyota Landscape Co. v. Building Material & Dump Truck Drivers Local No. 420, 726 F.2d 525, 527-29 (9th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 104, 83 L.Ed.2d 49 (1984). In the meantime, however, Sun-Land's employees elected the Independent Union of Craftsmen (Independent Union) as their new bargaining representative.
 
 
 5
 Many of the general contractors in the area in which Sun-Land does business are parties to various multi-employer agreements that prohibit the subcontracting of work to any employer that does not have a current bargaining agreement with the Laborers or one of the basic craft unions specifically named in the agreements (the Major Unions).[1] Sun-Land claims that, as a result of these subcontracting limitation clauses and its lack of affiliation with either the Laborers or any of the Major Unions, its business suffered drastically and hence the quantity of goods it purchased in interstate commerce declined. It therefore brought suit against the Laborers arguing that the subcontracting clauses constitute both an unfair labor practice under section 8(e) of the NLRA and an unreasonable restraint of trade under sections 1 and 2 of the Sherman Act.
 
 
 6
 The district court filed an exhaustive and well-reasoned opinion granting summary judgment in favor of the Laborers. The court held that under the construction industry proviso, the challenged clauses are exempt from section 8(e)'s prohibition against hot cargo agreements, and that Sun-Land's claims did not raise a triable issue under the Sherman Act. The district court reasoned that Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982) (Woelke), compelled the section 8(e) holding and relied on Brogan v. Swanson Painting Co., 682 F.2d 807 (9th Cir.1982), for its holding on the antitrust issue. The district court concluded that Brogan amounted to an implicit rejection of the balancing of labor and antitrust policies advanced by one member of the panel in Ackerman-Chillingworth v. Pacific Electrical Contractors Association, 79 F.2d 484, 501-05 (9th Cir.1978) (Hufstedler, J., concurring in part and dissenting in part), cert. denied, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). Finally, the district court concluded that its award of summary judgment dismissing the antitrust claim was not inconsistent with Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), or United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).
 
 
 7
 The panel affirmed the district court's section 8(e) holding. It also held that restrictive subcontracting agreements are valid under the Sherman Act only to the extent that they are the "least restrictive means" of accomplishing legitimate labor goals, and it remanded for a balancing of labor and antitrust policies. This court withdrew that opinion and ordered rehearing en banc. 779 F.2d 1446 (9th Cir.1986)(en banc).
 
 II. CONSTRUCTION INDUSTRY PROVISO
 
 8
 Sun-Land argues that the "particular unions" subcontracting clauses violate section 8(e) of the NLRA. There are no material facts in dispute and both parties agree that the clauses fall within the general prohibition of section 8(e).[2] Both parties also agree that a literal reading of the construction industry proviso would exempt the clauses from section 8(e) liability.[3] The parties do dispute the applicability of the proviso in light of legislative history and judicial interpretation. This issue is reviewable de novo. United States v. McConney, 728 F.2d 1195, 1202-04 (9th Cir.) (en banc), cert. denied, --- U.S. ----, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 9
 Sun-Land notes that the Supreme Court has held that the construction industry proviso is not to be construed literally but " 'must be interpreted in light of the statutory setting and the circumstances surrounding its enactment' " in 1959. Woelke, 456 U.S. at 653, 102 S.Ct. at 2077 (quoting Connell, 421 U.S. at 628, 95 S.Ct. at 1838). It points to Connell, where the Court interpreted these circumstances and held that, despite the literal language of the proviso, Congress had not intended to insulate from liability agreements obtained outside the context of collective bargaining. See Connell, 421 U.S. at 633, 95 S.Ct. at 1840. The Laborers counter that their agreement arose within a collective bargaining relationship and that Woelke held that a similar subcontracting clause fit within the construction industry proviso. We agree that the Woelke decision applies to the clause at issue here.
 
 
 10
 In Woelke, the Court was faced with a subcontracting limitation clause very similar to that of the Laborers' Agreement.[4] The Court rejected the nonunion employer's claim that the proviso shelters subcontracting clauses only when they are limited in application to particular jobsites at which both union and nonunion workers are employed. 456 U.S. at 654, 102 S.Ct. at 2077. The Court concluded that the "construction industry proviso to Sec. 8(e) ... ordinarily shelters union signatory subcontracting clauses that are sought or negotiated in the context of a collective-bargaining relationship...." Id. at 666, 102 S.Ct. at 2083.
 
 
 11
 Sun-Land argues that Woelke is distinguishable for a number of reasons. Most importantly, Sun-Land contends that Woelke only sanctioned subcontracting clauses that operate to exclude non-union contractors; the clause here excludes "other-union" subcontractors. While Woelke does not specifically address the "other-union" situation, its teaching that whether a clause is within the coverage of the proviso is determined "by examining Congress' perceptions regarding the status quo in the construction industry," id. at 657, 102 S.Ct. at 2078, directs us to uphold the Laborers' subcontracting clause. Congress believed broad subcontracting clauses were legal in 1959. Id. Despite its awareness that such clauses could be used to exclude subcontractors represented by other unions, as well as non-union employers, it enacted the proviso. Woelke recites the legislative history of section 8(e), which includes a reference to the other-union situation:
 
 
 12
 The House Labor Committee heard similar testimony. Representatives of an employer and an independent union complained that employers and unions could lawfully enter into subcontracting clauses, and that, as a result, employers whose employees had selected another union were denied any opportunity to compete for construction jobs. They described agreements very similar to those at issue here.
 
 
 13
 Woelke, 456 U.S. at 658, 102 S.Ct. at 2079 (citing Labor-Management Reform Legislation: Hearings on H.R. 3540, H.R. 3302, H.R. 4473, and H.R. 4474 before a Joint Subcomm. of the House Comm. on Education and Labor, 86th Cong., 1st Sess. 2363, 2365-66 (1959)(remarks of Howard Lane and Edward M. Carleton)). Congress heard this argument but nevertheless "decided to exclude the construction industry from the scope of Sec. 8(e)." Woelke, 456 U.S. at 658 n. 10, 102 S.Ct. at 2079 n. 10. We must give effect to Congress' intent and hence affirm the district court's conclusion that the construction industry proviso covers the agreement before us. Whether the section 8(e) proviso applies to union specific subcontracting clauses has been resolved by Woelke and we do not have the power to reexamine that question as suggested by the dissent.[5]
 
 
 14
 Sun-Land also argues that Woelke does not control this agreement because Woelke sustained subcontracting restrictions on the basis of two assumptions: that there is generally only one union representing a particular craft, and that subcontractors could enter into single job "pre-hire" agreements with the designated union and thus remain eligible to work. Neither of these assumptions appears valid in Sun-Land's situation. Several unions represent landscaping employees. Any agreement with the Laborers would violate Sun-Land's collective bargaining agreement with the Independent Union. While the Court in Woelke mentioned these points as considerations, see Woelke, 456 U.S. at 663 n. 15, 664, 102 S.Ct. at 2082 n. 15, neither was controlling. The Court did recognize that "the use of union signatory subcontracting clauses [may] give a particular union a monopoly position in a labor market," id. at 663 n. 15, 102 S.Ct. at 2082 n. 15, yet upheld such clauses nevertheless.
 
 
 15
 We conclude that the clause under consideration does not violate section 8(e).III. ANTITRUST EXEMPTION
 
 
 16
 Sun-Land argues that, irrespective of the validity of the agreements under section 8(e), those agreements violate sections 1 and 2 of the Sherman Act because they constitute an illegal group boycott and evidence a concerted refusal to deal.[6] The Laborers contend that once a clause is found to be valid under section 8(e), it is automatically exempt from antitrust liability.
 
 
 17
 Organized labor enjoys two types of exemptions from federal antitrust laws: statutory and nonstatutory. Granddad Bread, Inc. v. Continental Baking Co., 612 F.2d 1105, 1109 (9th Cir.1979), cert. denied, 449 U.S. 1076, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981). The sources of the statutory exemption include the Clayton Act, 15 U.S.C. Sec. 17 (1982) and 29 U.S.C. Sec. 52 (1982), and the Norris-LaGuardia Act, 29 U.S.C. Secs. 104, 105, 113 (1982), which except some union activities from antitrust scrutiny. Connell, 421 U.S. at 621-22, 95 S.Ct. at 1834-35. "They do not exempt concerted action or agreements between unions and nonlabor parties." Id. at 622, 95 S.Ct. at 1835. Hence, the statutory exemption does not apply here because the Laborers combined with nonlabor groups through the collective bargaining agreements.
 
 
 18
 The Supreme Court has recognized a limited nonstatutory exemption, which "has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions." Id. Thus some union-employer agreements are exempt from antitrust sanctions as part of the "proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets." Id. The nonstatutory exemption, then, may be invoked in cases involving valid collective bargaining agreements between unions and employers on wages or working conditions.
 
 
 19
 We cannot accept the Laborers' contention that, once an agreement is found to be within the construction industry proviso to section 8(e), it is entirely and invariably beyond the reach of the antitrust laws. We find a suggestion to the contrary in United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), one of the earliest cases defining the nonstatutory exemption. There the Supreme Court dealt with an alleged conspiracy among major coal companies and a union to drive smaller, competing coal companies out of business. The union was said to have agreed with the major companies to impose a uniform high wage upon the smaller companies "regardless of their ability to pay and regardless of whether or not the union represented employees of these companies, all for the purpose of eliminating them from the industry." Id. at 664, 85 S.Ct. at 1590. The union contended that, because such an agreement concerned wage standards, it was exempt from the antitrust laws. The Supreme Court rejected that defense. The Court recognized that simple wage agreements between unions and multi-employer bargaining units do not violate the antitrust laws, but added that "[t]his is not to say that an agreement resulting from union-employer negotiations is automatically exempt from Sherman Act scrutiny simply because the negotiations involve a compulsory subject of bargaining...." Id. The Court concluded that a union "forfeits its exemption from the antitrust laws" when it becomes a party to a conspiracy with one set of employers to eliminate competitors to those employers. Id. at 665-66, 85 S.Ct. at 1590-91.
 
 
 20
 Pennington makes it clear, therefore, that a union that is otherwise guilty of a conspiracy in violation of the antitrust laws cannot escape liability merely because some of the means of accomplishing the goals of that conspiracy were embodied in a collective bargaining agreement. In so holding, the Court emphasized that nothing in national labor policy favored such activity. Id. at 666, 85 S.Ct. at 1591. The Court's decision, however, falls far short of establishing Sun-Land's case. For Pennington makes it equally clear that in the absence of such a conspiracy, a union is free to pursue its own bargaining objectives in the traditional way without interference from the antitrust laws. The union in Pennington was entitled, for example, to adopt its own uniform wage policy and to seek to implement it even though it suspected that the result would be to deprive some of the weaker employers in the industry of the ability to compete. Id. at 665 n. 2, 85 S.Ct. at 1591 n. 2.
 
 
 21
 The Supreme Court directly protected parties to a multi-employer collective bargaining agreement from the antitrust laws in Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), decided the same day as Pennington. In Jewel Tea, a fractured Court found that a marketing-hours restriction in a collective bargaining agreement obtained by the unions through "bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, [fell] within the protection of the national labor policy and [was] therefore exempt from the Sherman Act." Id. at 690, 85 S.Ct. at 1602 (White, J.) (plurality opinion). Justice White's opinion, joined by two other justices, noted that the "crucial determinant is not the form of the agreement ... but its relative impact on the product market and the interests of union members." Id. at 690 n. 5, 85 S.Ct. at 1602 n. 5. Because the interest of union members in the hours of operation was immediate and direct, the agreement was beyond the reach of the Sherman Act even though "the effect on competition [was] apparent and real." Id. at 691, 85 S.Ct. at 1603. Jewel Tea did not, however, muster a majority for the view that collective bargaining activity concerning mandatory subjects of bargaining could never be subjected to antitrust scrutiny. Justice Goldberg, concurring, embraced that position, but he was joined by only two other justices. The three dissenting justices would have held the agreement a violation of the antitrust laws.
 
 
 22
 The Supreme Court's most recent case dealing with the nonstatutory exemption is Connell. There the Court held that the construction industry proviso to section 8(e) does not apply to agreements obtained outside the context of collective bargaining, 421 U.S. at 633, 95 S.Ct. at 1840, and that such agreements cannot claim the nonstatutory exemption. Id. at 625, 95 S.Ct. at 1836. The Court merely noted that "[t]here can be no argument in this case, whatever its force in other contexts, that a restraint of this magnitude might be entitled to an antitrust exemption if it were included in a lawful collective-bargaining agreement." Id. at 625-26, 95 S.Ct. at 1836-37 (citing Pennington and Jewel Tea).
 
 
 23
 Two Ninth Circuit cases, although not dealing with subcontracting clauses, generally support our holding. In California Dump Truck Owners Association, Inc. v. Associated General Contractors, 562 F.2d 607 (9th Cir.1977), we found that a valid collective bargaining agreement, "by itself, does not violate the federal antitrust laws." Id. at 614. In Granddad Bread we held that a work preservation clause, valid under the nonstatutory exemption, was not sufficient evidence of antitrust violation by itself to justify submission to the jury. 612 F.2d at 1111. In both cases, then, we concluded that evidence in addition to a valid provision of a collective bargaining agreement is required in order to establish an antitrust violation. In neither did we state that such a provision could never be considered as evidence of an antitrust violation, if other evidence was also introduced.
 
 
 24
 In Brogan v. Swanson Painting Co., 682 F.2d 807 (9th Cir.1982), this court considered a situation similar to the one at issue here. In determining whether a subcontracting clause was "in violation of Sec. 8(e) and the antitrust laws," id. at 810, we concluded that, under Woelke, "the construction industry proviso to Sec. 8(e) shelters union signatory subcontracting clauses that are sought or negotiated in the context of a collective bargaining relationship." Id. We therefore reversed the district court's judgment holding the clause unenforceable. We did not further elaborate on the scope or nature of the nonstatutory exemption.
 
 
 25
 Other circuits seem to agree with our holdings. An early Seventh Circuit case, Suburban Tile Center, Inc. v. Rockford Building & Construction Trades Council, 354 F.2d 1 (7th Cir.1965), cert. denied, 384 U.S. 960, 86 S.Ct. 1585, 16 L.Ed.2d 673 (1966), holds that an agreement coming within the construction industry proviso does not constitute a violation of the antitrust laws. And the Eleventh Circuit, while noting that it "express[ed] no opinion regarding the application of the nonstatutory exemption to these facts," upheld a grant of summary judgment for the defendant on a subcontracting clause found valid under the proviso to section 8(e) since no other evidence of antitrust violations was presented. A.L. Adams Construction Co. v. Georgia Power Co., 733 F.2d 853, 855 n. 5 (11th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2155, 85 L.Ed.2d 511 (1985). Neither case discusses anticompetitive purposes other than those necessary to attain collective bargaining goals which do not violate labor law.
 
 
 26
 We think it apparent from the Supreme Court's decisions in Pennington and Jewel Tea, and implicit in decisions of this and other circuits, that subcontracting clauses within the construction industry proviso to section 8(e) must be given breathing room to operate in their intended fashion without interference from the antitrust laws. While we refuse to rule that such clauses are wholly exempt from scrutiny if they are shown to be instruments of an antitrust conspiracy otherwise existing, we hold that a valid subcontracting clause contained in a collective bargaining agreement cannot serve as the basis of an antitrust claim. Yet Sun-Land has attempted to make the clauses the foundation of its antitrust claim here. As the Supreme Court stated in an analogous context, "[n]o case under the antitrust laws could be made out on evidence limited to such union behavior." Pennington, 381 U.S. at 665, 85 S.Ct. at 1591.
 
 
 27
 We recognize that an agreement restricting subcontracting has anticompetitive effects. It adds nothing to Sun-Land's claim, however, to argue that the intent or the effect of the clauses was to preclude Sun-Land from obtaining contracts because its employees were not represented by Laborers. That anticompetitive effect is part of the natural operation of a subcontracting clause; the goals of federal labor law could never be achieved if every anticompetitive effect on business caused by collective bargaining were held to be a violation of the antitrust laws. See Connell, 421 U.S. at 622, 85 S.Ct. at 1835.
 
 
 28
 Congress would not have exempted the construction industry from the prohibition against "hot cargo" clauses only to have such provisions create liability under the antitrust laws. Moreover, the policy behind the provision would be ill-served if parties to such agreements were required to undergo trials on charges of antitrust violations solely because of the hot cargo provision or its intended anticompetitive effects.
 
 
 29
 There is no question on this record concerning the nature of Sun-Land's antitrust claims. Sun-Land's sole summary judgment submission on those claims states:
 
 
 30
 [T]he parties are in complete agreement that the following issues of law and no others are involved in this action[:]
 
 
 31
 2. Whether or not the subcontracting clauses in the collective bargaining agreements ... are violative of Sections 1 and 2 of the Sherman Act;
 
 
 32
 3. Whether or not the subcontracting clauses in the collective bargaining agreements ... fall outside the coverage of the Sherman Act as a result of the labor exemptions from antitrust law.
 
 
 33
 Sun-Land's evidence of antitrust liability is clearly limited to the subcontracting clauses. The dissent disputes this conclusion and contends that we are "simply wrong" in our summary judgment analysis. It would have us remand to allow Sun-Land to produce additional facts demonstrating anticompetitive intent and conduct. The cross motions for summary judgment were heard in the district court pursuant to the stipulation setting forth the sole issues involved in the action. Having stipulated that no issues of law were involved in the action other than those concerning the subcontracting clause, Sun-Land cannot now seek to raise additional claims.
 
 
 34
 The nonstatutory exemption from the antitrust laws applies. Thus summary judgment against Sun-Land was proper, and although the district court may not have expressly relied on this rationale, we may affirm on any ground finding support in the record. Islamic Republic of Iran v. Boeing Co., 771 F.2d 1279, 1288 (9th Cir.1985).
 
 The judgment of the district court is
 
 35
 AFFIRMED.
 
 
 36
 JAMES R. BROWING, Chief Judge, concurring and dissenting:
 
 
 37
 I concur in the majority opinion except in its treatment of the parties' stipulation. Because I agree with the dissent that the stipulation was meant only to specify the issues appropriate for summary judgment, and not to foreclose the parties from pursuing other legal theories if both summary judgment motions were denied, I would remand for further proceedings.
 
 
 38
 WIGGINS, Circuit Judge, with whom KENNEDY, ALARCON and BRUNETTI, Circuit Judges, join, dissenting:
 
 
 39
 Because I disagree with the majority's reasoning on one issue and with its result on a second, I respectfully dissent.
 
 I. The Construction Industry Proviso
 
 40
 The district court's first ground for granting the defendants' summary judgment[1] was that the subcontracting provision in the defendants' contracts was, standing alone, within the construction industry proviso of section 8(e) as a matter of law. (ER 77, 4:14-9:3).[2] Thus, as the case comes to us, we must determine de novo whether the clause alone suffices to invoke the shelter of the construction industry proviso of section 8(e).
 
 
 41
 This posture raises an immediate problem: the language of the clause itself is insufficient to answer the question we must determine. Other facts must be known to determine whether the construction industry proviso applies. For example, what was the purpose of this union in exacting the union-specific clause in the master contract? Did it seek to drive nonunion contractors out of the business market? Did it seek a jurisdictional advantage with a competing union? Was the clause consistent with maintaining or bettering the wages, hours, and working conditions of its members, or did the union have another purpose in mind?
 
 
 42
 Basic national labor policy, reflected in section 8(e), declares hot cargo agreements to be illegal. The construction industry proviso to section 8(e) is an exception to this basic rule. It should thus be interpreted narrowly, so as to reach the Congressional goal in creating it, but to go no further. The legislative history is sparse, making precise determination of Congress's purpose difficult. Generally, however, if the purpose of the bargaining parties (usually the union) in insisting on a subcontracting clause is consistent with usual union interests (i.e., the wages, hours, and working conditions of its members), the courts hold that a particular clause falls within the construction industry proviso and thus beyond the general proscription of section 8(e). See Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 628-31, 95 S.Ct. 1830, 1837-839, 44 L.Ed.2d 418 (1975) (union's hot cargo clause not within section 8(e)'s construction industry proviso because it was not concerned with the legitimate concerns of employees (representation, working alongside nonunion workers) but to pressure nonsignatories into recognition); cf. Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965) (finding a marketing hours limitation contained in a multiemployer contract exempt from antitrust liability because its purpose was to protect the wages, hours, and working conditions of the union's members); United Mine Workers v. Pennington, 381 U.S. 657, 665-67, 85 S.Ct. 1585, 1590-91, 14 L.Ed.2d 626 (1965) (holding that contract provision not exempt from antitrust scrutiny merely because arrived at in collecting bargaining context and dealing on its face with wages if true purpose was to curtail competition in the marketplace).
 
 
 43
 A party to a contract should not be able to insulate itself from an examination of the purpose of its contract provisions simply by adopting certain "approved" language. This is especially true where, as here, the provision has an adverse effect on a nonparty. One party to the contract may negotiate for language in a contract that is in lawful form but that is intended to achieve an unlawful object. The other contracting party may accept such language because it does not adversely affect that party. If an aggrieved non party is to have any recourse against the unlawful object, the nonparty must therefore be free to prove the true intent of the parties to the contract, notwithstanding the facial conformity of the contract with the law. Moreover, the same contract language may evidence a legal purpose under one circumstance and an illegal purpose in another. The real purpose can therefore be detected only by examination of the circumstances of the specific case.
 
 
 44
 In the present case, the subcontracting clause is union specific. Such a clause may evidence that the union was (a) trying to ensure work for its union members, or (b) trying to freeze an employer out of the market by illegal means. If there is only one union, argument (b) is inapplicable, and argument (a) becomes a permissible top-down pressure device to have nonunion workers join the union. See Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 662-65, 102 S.Ct. 2071, 2081-83, 72 L.Ed.2d 398 (1982) (concluding that Congress intended to allow whatever top-down pressures for unionization might arise from subcontracting agreements reached in the context of the collecting bargaining relationship). If there is more than one union, argument (b) may apply and the clause becomes an improper economic weapon against a nonsignatory employer affiliated with another union, effectively allowing the first union to prevent such an employer from doing business. See, e.g., Connell, 421 U.S. at 624-25, 95 S.Ct. at 1836-37 (noting the "significant adverse effects" of allowing unions to exclude certain subcontractors from the market, citing Pennington or to create a closed market). Such a direct restraint on the business market might have "substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions." Id. at 625, 95 S.Ct. at 1836. The provision would therefore fall outside the nonstatutory exemption to the antitrust laws. Id.
 
 
 45
 Consequently, under the circumstances of this case, I would not hold that the contract provision falls within the construction industry proviso of section 8(e) as a matter of law. Where, as here, the provision is consistent with the union's intent to accomplish two different purposes, one legal and one illegal, the court must look beyond the mere recitation of previously approved language and determine the parties' actual intent as a matter of fact. That intent is a disputed fact here,[3] and I would remand to the district court to determine it.
 
 II. The Sherman Act Issue
 
 46
 The district court also granted summary judgment for defendants on the ground that the subcontracting clause in the collective bargaining agreements falls outside the coverage of the Sherman Act as a result of the labor exemptions from antitrust law. The district court did not hold, as the majority states, "that Sun-Land's claims did not raise a triable issue under the Sherman Act." It is this misunderstanding of the posture in which this case reaches us that requires me to dissent on this second issue. I agree with the majority's resolution of the legal issue it defines; I cannot agree with the majority's ultimate result in the posture of this case.
 
 
 47
 The majority properly concludes that agreements that are valid under the labor laws are not thereby automatically exempt from the antitrust laws. As the majority correctly notes, such per se exemption is incompatible with the Supreme Court's decision in Pennington and its fragmented opinions in Jewel Tea and Connell. Even if the clause furthers the normal interests of the contracting labor union (and hence is valid under 8(e)), it may adversely affect competition in a manner different in kind or degree from the adverse impact implicit in every collective bargaining contract containing a subcontracting clause.
 
 
 48
 I also agree that a contract provision alone is insufficient to support an antitrust claim if that provision is valid under the construction industry proviso to section 8(e). Because of the general use of such hot cargo provisions, a contrary holding could result in widespread antitrust litigation based solely on such provisions, a result clearly not intended by Congress. Although a valid construction industry hot cargo provision may be probative evidence of an antitrust violation, it is not alone sufficient to prove such a violation. Proof of such a violation also requires other evidence of anticompetitive intent or conduct, unprotected by labor law.
 
 
 49
 The preceding analysis comprehensively addresses the only Sherman Act issue before us on this appeal. We did not take this case en banc, as the majority asserts,
 
 
 50
 to determine whether a provision of a collective bargaining agreement falling within the construction industry proviso is, without more, sufficient evidence of an antitrust violation to withstand a summary judgment motion.
 
 
 51
 Majority opinion at 1112.[4] Indeed, we could not have taken the case to determine this issue, because the issue is not raised on this appeal.[5] Sun-Land does not urge that the contract language is sufficient to create liability; it merely urges that the contract language is not sufficient to insulate the defendants from liability.
 
 
 52
 To understand the majority's error, it is important to understand the posture of this case. This appeal is from a district court summary judgment based on a resolution of a single antitrust issue. The defendants carefully framed this issue in their summary judgment motion to present a clear-cut legal question: is a subcontracting clause that is valid under the construction industry proviso of section 8(e) of the LMRA automatically exempt under the Sherman Act? This presented a purely legal question: whether, regardless of what other anticompetitive intent or conduct Sun-Land alleged or proved, the validity of the contract provision under section 8(e) was an absolute bar to antitrust liability. A thorough examination of the pleadings below and the district court's memorandum, as evidenced by the citations in the margin, confirms that the issue presented and decided was always regarded by all parties and the court as the pure legal question of whether section 8(e) validity creates a per se exemption from the antitrust laws.[6]
 
 
 53
 The district court granted summary judgment, holding that a contract provision's validity under the construction industry proviso absolutely barred antitrust liability. This summary judgment was in effect a dismissal on the pleadings, as no facts were involved and the decision turned solely on the legal effect of the contract provision. The majority of this court today correctly rejects the district court's analysis, holding instead that a contract provision valid under section 8(e) does not insulate contracting parties from antitrust liability if there is additional anticompetitive intent or conduct. Ordinarily, such a holding by this court would result in reversal and remand to the district court for the determination of this question of fact.
 
 
 54
 In the present case, however, the majority invokes the well-recognized doctrine that a court of appeals may affirm on any ground finding support in the record, even though the lower court did not rely on that ground. In a single paragraph, the majority decides that Sun-Land's complaint and summary judgment allegations do not allege any anticompetitive intent or conduct beyond the contract language itself and concludes that Sun-Land relies exclusively on the subcontracting clause for its claim of antitrust liability. The majority therefore holds that summary judgment is proper as a matter of law.
 
 
 55
 Leaving aside the fairness of granting a dismissal on the pleadings without leave to amend based on a new legal standard that the drafter of the complaint had no way of anticipating, the majority's analysis of the case is simply wrong. The complaint below in fact alleged the additional anticompetitive intent and conduct required by the majority's analysis, and Sun-Land continues to press those claims to this day. These allegations are not prominent in the summary judgment materials simply because there was no need for them to be there.
 
 
 56
 First, the complaint itself is replete with allegations of anticompetitive conduct other than the disputed contract. It alleges anticompetitive agreements other than the disputed contract (ER 1, 5:20-24). It alleges threats and coercion against present and prospective customers of Sun-Land intended to induce them not to do business with Sun-Land, within the terms of the disputed contract or otherwise, as a means of putting Sun-Land out of business (ER 1, 16:15-22). It also alleges threats and coercion against present and prospective customers of Sun-Land intended to induce Sun-Land to recognize the Laborers as its bargaining representative, in violation of the NLRB certification of the present, independent union as bargaining agent (ER 12:7-13:6; 17:3-8). Finally, the complaint alleges an intent to destroy competition or control prices in the commercial landscape industry (ER 1, 17:35). Some of these allegations are admittedly general, but that is hardly surprising in a complaint drafted before discovery.
 
 
 57
 Neither side offered affidavits supporting or opposing the motions grounded in antitrust.[7] This is logical: because the parties framed defendants' summary judgment motion as a purely legal question dependent solely on the contract language, any additional facts would have been irrelevant. There was no need for allegations of fact by affidavit at the time the district court granted the summary judgment motion we review here. This court therefore should not rely on the absence of such facts to affirm the summary judgment.
 
 
 58
 In addition, the summary judgment motion was heard on facts stipulated only for the purpose of the cross motions for summary judgments. This is apparent from the very caption of the stipulation: "Joint Statement of Uncontroverted Facts and Issues of Law Re Cross Motions for Summary Judgment " (ER 55 (emphasis added)). The statement contained only the facts necessary to resolve the purely legal issues presented. Even in this stipulation, however, Sun-Land included facts that suggest additional anticompetitive conduct and intent on the part of the defendants. The statement notes the Teamsters' earlier association with Sun-Land and its employees, the Teamsters' abrupt disclaimer of that association, and the ensuing court action that resulted in the finding of unfair labor practice on the Teamsters' part. ER 55, 4:22-6:6; see also Toyota Landscape Co. v. Building Material & Dump Truck Drivers Local No. 420, 726 F.2d 525 (resolving the court action), cert. denied, --- U.S. ----, 105 S.Ct. 104, 83 L.Ed.2d 49 (1984). The defendants objected to the inclusion of these facts as irrelevant (ER 55, 6:7-8), as indeed they were to the ground on which the district court granted defendants' motion, the automatic antitrust exemption. The facts are certainly relevant, however, to the campaign of anticompetitive conduct on the part of local contractors and labor unions that Sun-Land alleges in its complaint. On their face, these facts suggest earlier, illegal anticompetitive actions against Sun-Land. In any event, they are certainly inconsistent with the majority's conclusion that Sun-Land relies solely on the hot cargo language for antitrust liability.
 
 
 59
 Moreover, Sun-Land's memoranda in the district court make clear that Sun-Land recognized the possibility of disputed facts should the court deny the motions for summary judgment. Indeed, Sun-Land's own cross-motion for summary judgment is grounded on the defendants' failure to present any evidence that the subcontracting provision was the " 'least restrictive means to obtain legitimate union goals.' " (ER 64, 16:12-22:23 (quoting Pennington)). Sun-Land argued that in light of this failure and the unique circumstances of the case, the subcontracting agreement was as a matter of law not the least restrictive means, entitling Sun-Land to summary judgment. Although Sun-Land's cross-motion was denied and not appealed, its arguments in support of that cross-motion clearly indicate that Sun-Land had additional evidence to prove anticompetitiveness[8] and did not offer it merely because both summary judgment motions presented pure questions of law and the evidence was therefore irrelevant to them. Even the district court's memorandum implicitly recognized this aspect of Sun-Land's position. See ER 77, 9:5-16:26 ("Sun-Land claims that regardless of validity of the clause under the NLRA, the Court must engage in an independent analysis of the antitrust consequences.").
 
 
 60
 I do not normally take exception to the practice of affirming district court judgments on grounds different from those relied on by the district court. This practice serves both judicial economy and the parties' interests. Such an affirmance is justified, however, only "if the issue was litigated in the trial court, and if the record presented is such as to permit decision." M.O.S. Corp. v. John I. Haas Co., 375 F.2d 614, 617 (9th Cir.1967). In the present case, neither the parties, the district court, nor the three-judge panel of this court considered the sufficiency of the complaint under the antitrust standard the majority sets forth today, nor did any of them consider the presence or absence of disputed facts material to the application of that standard. The first time such concerns were raised was at oral argument before the en banc panel of this court. The raising of the issue prompted the following comments in a letter to the court from Sun-Land's counsel:
 
 
 61
 With respect to the comments and inquiries ... as to the sufficiency of certain allegations in the Complaint and whether the Complaint had withstood the summary judgment motion, I would respectfully request that the parties be given an opportunity to submit supplemental briefs on this issue. The sufficiency of Plaintiff's Complaint was never challenged by the Defendants before the District Court or the 3-Judge Panel of this Court, nor was it raised by either of these tribunals. The comments of the En Banc Panel represent the first occasion that the sufficiency of the allegations of Plaintiff's Complaint were challenged or placed in issue. Since this question has never been briefed by the parties and came as a complete surprise to me, I would urge the Court to allow the parties to submit supplemental briefs addressed to the issue of whether the allegations of the Complaint are sufficient to plead a prima facie violation of the Sherman Act and withstand a motion for summary judgment on the affirmative defense, that regardless of what is alleged, the challenged conduct is automatically and absolutely exempt from antitrust scrutiny solely because the restraint is contained within a collective bargaining agreement arguably privileged by the construction industry proviso to Section 8(e). Because this issue has not been heretofore raised or addressed, additional briefing may be necessary. (Emphasis in original).
 
 
 62
 We denied this request by Sun-Land, which merely asks that it be allowed to address at least once the issue that forms the basis for the majority's decision against it.
 
 
 63
 In light of the fact that the issues of sufficiency of the complaint and the existence of material issues of disputed fact were not addressed by the court below, have never been argued by the parties, and are unreachable in the present posture of this case, I believe the majority errs in deciding the case on those grounds.
 
 
 64
 Accordingly, I dissent.
 
 
 
 [1]
 The 1980-83 Master Labor Agreement provides:
 [N]either the Contractor nor any Subcontractor on the jobsite will subcontract any work to be done at the site of construction, alteration, painting or repair of a building, structure or other work, except to a person, firm or corporation, party to a current labor agreement with the Union, or the basic crafts, namely, the Carpenters, Cement Masons, Operating Engineers and Teamsters who are also party to an agreement covering the particular work generally recognized as the jurisdiction as defined by the Building and Construction Trades Department.
 
 
 [2]
 Section 8(e) of the NLRA provides in part:
 (e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void....
 29 U.S.C. Sec. 158(e).
 
 
 [3]
 The construction industry proviso to section 8(e) states:
 Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work.
 29 U.S.C. Sec. 158(e).
 
 
 [4]
 The clause in Woelke provided:
 The Contractor agrees that neither he nor any of his subcontractors on the jobsite will subcontract any work to be done at the site of construction, alteration, painting or repair of a building, structure or other work (including quarries, rock, san[d] and gravel plants, asphalt plants, ready-mix concrete plants, established on or adjacent to the jobsite to process or supply materials for the convenience of the Contractor for jobsite use) except to a person, firm or corporation, party to an appropriate, current labor agreement with the appropriate Union, or subordinate body signatory to this Agreement.
 456 U.S. at 649 n. 1, 102 S.Ct. at 2074 n. 1.
 
 
 [5]
 In addition, the dissent would require a trial over the purpose of a subcontracting clause even though the issue is not specifically raised by the defendant, or if raised, no proof of impermissible purpose is submitted in response to a motion for summary judgment. Such a requirement would needlessly encourage litigation, and would tend to thwart the apparent intent of Congress in enacting the section 8(e) proviso
 
 
 [6]
 The dissent contends that the argument presented by Sun-Land is not that "the contract language is sufficient to create liability; it merely urges that the contract language is not sufficient to insulate the defendants from liability." Infra at 1120-1121. We disagree. The issue on appeal was clearly stated by Sun-Land itself in its opening brief: "Whether the challenged 'particular union' subcontracting restrictions violate Sections 1 and 2 of the Sherman Act irrespective of whether or not they are valid under section 8(e) of the Labor Act."
 
 
 [1]
 The district court first held that it had jurisdiction over Sun-Land's claims. The defendants do not appeal that ruling
 
 
 [2]
 The "Joint Statement of Uncontroverted Facts and Issues of Law Re Cross-Motions for Summary Judgment" misstates this issue as "Whether or not the subcontracting clauses ... are violative of Section 1 and 2 of the Sherman Act." (ER 55, 6:14-16) Thus stated, the issue would be a sloppy repetition of the Sherman Act issue stated immediately thereafter (ER 55, 6:17-20). The moving papers and the court's memorandum make clear that this issue involved whether section 8(e) of the NLRA was violated
 
 
 [3]
 I am aware that the majority believes there are no disputed facts in this case. For reasons discussed under section II, I disagree
 
 
 [4]
 I also note that such a generalization is impossible. Different members of the court majority who voted for en banc consideration may have had different reasons for voting to rehear the case. We have no formal mechanism for granting rehearing on specific issues. At most, we may request parties to brief specific issues, and we made no such request in this case. On the contrary, we have denied the appellant leave to brief this very issue, on which the majority bases its decision. See infra
 
 
 [5]
 The issue was raised below in Sun-Land's cross-motion for summary judgment. Sun-Land in effect argued that the contract language created a rebuttable presumption of antitrust liability as a matter of law, regardless of whether the language was valid under the construction proviso. Because the defendants had failed to present any evidence that the disputed clause was the least restrictive means of accomplishing the defendants' legitimate objectives, Sun-Land argued, Sun-Land was entitled to summary judgment. The district court denied Sun-Land's motion, and that denial is not appealed from
 
 
 [6]
 ER 58, 32:7-38:16 (Plaintiff's Memorandum of Points and Authorities In Support of Cross-Motion for Summary Judgment) ("Defendants have adamantly maintained throughout the entire course of this litigation that ... such restrictions are ipse dixit exempt from antitrust scrutiny under the Sherman Act."); ER 58, 38:17-44:2 ("Defendants also theorize that ... the instant subcontracting restrictions are automatically exempt from antitrust scrutiny under the Sherman Act."); ER 59, 9:19-10:14 (Defendants' Notice of Motion and Motion for Summary Judgment; and Points and Authorities) ("[T]he question this court is asked, is whether the construction industry proviso constitutes an implied exemption to the antitrust laws."); ER 64, 8:21-16:11 (Plaintiff's Reply Memorandum of Points and Authorities in Support of Cross-Motions for Summary Judgment) ("[I]t is clear that the validity of a particular provision of the Labor Act does not ipse dixit result in its automatic exemption from antitrust scrutiny under the Sherman Act."); ER 66, 17:1-18:18 (Defendants' Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment) ("The Jewel Tea Court could not make more clear that once a restriction falls within the protection of labor law, no more balancing need be done, but that restriction is 'therefore exempt from the Sherman Act.' "); ER 71A, 6:3-9, 6:22-7:13 (Reporter's Transcript) ("[E]ven assuming arguendo these provisions were valid under 8(e), ... that doesn't determine anything."); ER 77, 9:5-16:26 (Second Amended Memorandum of Decision and Order) ("Defendants claim that the Sherman antitrust laws cannot be violated when the provision is valid under the NLRA")
 
 
 [7]
 The only declaration filed in relation to the motions at all was on the issue of jurisdiction, which is not on appeal here
 
 
 [8]
 For example, Sun-Land points out that its wages, hours, and working conditions were the same for the new union as they had been when its employees were represented by the Teamsters, suggesting that the subcontracting clause was not related to the legitimate union goals of improving employees' wages, hours, and working conditions. See, e.g., Donald Schriver, Inc. v. NLRB, 635 F.2d 859, 880 (D.C.Cir.1980) ("The only way that workers in the employment pool may be certain to receive the protection and benefits provided by the master contract is if subcontracting is limited to subcontractors who are signatory to that agreement or who provide identical terms." (emphasis added)), cert. denied, 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981)